AO 91 (REV.5/85) Criminal Complaint

AUSA Valarie Hays (312) 353-8709

**FILED**

# UNITED STATES DISTRICT COURT

JAN 2 3 2006   NF

## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

**CRIMINAL COMPLAINT**

v.

JOSE ERASIMO AGUILERA,
JUAN PABLO ARMENTA, and
EDUARDO RAMIREZ (aka "ZORO")

CASE NUMBER

**06CR0054**

MAGISTRATE JUDGE ASHMAN

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

On or about January 20, 2006 in <u>Cook</u> County, in the <u>Northern</u> District of <u>Illinois</u> defendants did

conspire with each other and others to possess with intent to distribute and to distribute a controlled substance, namely in excess of 500 grams of mixtures and substances containing cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title <u>21</u> United States Code, <u>Section 846</u> and Title <u>18</u>, United States Code, <u>Section 2</u>.

I further state that I am a <u>Special Agent of the United States Drug Enforcement Administration</u> and that this complaint is based on the

following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof: <u>X</u> Yes __ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

<u>January 23, 2006</u>
Date

<u>Hon. Martin C. Ashman, U.S. Magistrate Judge</u>
Name & Title of Judicial Officer

at <u>Chicago, Illinois</u>
City and State

Signature of Judicial Officer

STATE OF ILLINOIS      )
                            )
COUNTY OF COOK      )

## AFFIDAVIT

Fernando Cervantes, having been duly sworn, states as follows:

1.     I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice, and have been so employed with the DEA for 19 months, Prior to working at the DEA, I was a Criminal Investigator with the Cook County State's Attorney's office for approximately five years. I am currently assigned to a DEA High Intensity Drug Trafficking Area (HIDTA) group and have been at that assignment for approximately six months. As part of my official DEA duties, I work on investigations involving the possession and distribution of narcotics, among other things, including criminal violations of federal narcotic laws, such as Title 21, United States Code, Sections 841, 843, and 846. I have also received specialized training in the enforcement of laws concerning the activities of narcotic traffickers.

2.     This affidavit is based upon my personal knowledge and information that I have received from other sources, including other law enforcement officers, cooperating individuals, law enforcement reports, my review of consensually-recorded conversations, and other documents. The information contained in the affidavit is not a complete summary of everything I know about this investigation. Instead, it is merely a summary of some of the facts necessary to provide probable cause for a complaint charging EDUARDO RAMIREZ (aka "ZORO"), JUAN PABLO ARMENTA, and JOSE ERASIMO AGUILERA with possession with intent to distribute a controlled substance,

1

namely, 500 grams or more of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

### Background

3.     On August 18, 2005, DEA agents received information from an individual who subsequently became a Confidential Source (CS)[1] for the DEA. The CS related he/she was introduced to "ZORO," a male Hispanic, approximately 25 years of age, by a friend. "ZORO" asked the CS if he/she was willing to make drug and money deliveries for him ("ZORO") and "Individual A," who lives in Arizona. CS stated he/she did not agree to work for "ZORO" or "Individual A" but was given money by "ZORO" to fly to Phoenix, Arizona and meet with "Individual A." The CS subsequently gave receipts of the Arizona flight and hotel to Agents. The CS informed Agents that "ZORO" lives at 600 Francis Street, Joliet Illinois.

4.     On August 29, 2005, Agents met with the CS for the purpose of making a recorded telephone call to "ZORO." The CS related that "ZORO" called the CS earlier that day and told the CS that he has not received a new phone number for "Individual A." The CS also related that "ZORO" told him that "Individual A" was running "low," but he might have somebody else from whom to get "stuff." The CS offered his/her trucking services to "ZORO" for the purpose of transporting drugs. "ZORO" replied that he would

_____

[1]The CS has been cooperating in this case in return for monetary payment. He has thus far received $500 from the DEA in return for the assistance and information he has provided. CS served approximately seven months in the IDOC in 1993-94 on a concurrent sentence for possession of a stolen vehicle and a controlled substance offense. In 1996, he was convicted of a dangerous drugs offense and served approximately one and a half years in the IDOC. CS also has prior arrests for burglary, obstruction of justice, assault, and a traffic offense.

call the CS back in a few hours. At approximately 9:05 p.m., the CS made a telephonic call to "ZORO" at the direction of Agents. "ZORO's" phone went to voice mail, and the CS left a message for "ZORO" to call the CS back.

5.      On September 5, 2005, Agents met with the CS in Bolingbrook, Illinois for the purpose of the CS calling and eventually meeting with "ZORO" to discuss a future drug deal. Under the direction of Agents, the CS called "ZORO"and left a voice mail message. "ZORO" subsequently called the CS back and gave the CS his new phone number. "ZORO" stated he would call the CS at a later time.   Several telephone conversations were subsequently recorded between the CS and "ZORO" pertaining to a possible drug deal.

6.      On November 28, 2005, the CS contacted Agents and related that "ZORO" called the CS and asked the CS if he/she was interested in making a multi-kilogram delivery of cocaine to Chicago from San Diego. The CS told "ZORO" that he/she would meet "ZORO" and his unknown source of supply on November 30, 2005.

7.      On November 30, 2005, Agents met with the CS for the purposes of making a recorded telephone call to "ZORO" and setting up a meeting location. At approximately 8:23 p.m., the CS called "ZORO" and left a voicemail message. At approximately 8:24 p.m., "ZORO" called the CS and stated that he would call the unknown source of supply and then call the CS. At approximately 8:56 p.m., "ZORO" called the CS and told the CS that the unknown subject was not returning his phone calls. The CS then asked "ZORO" to meet with the CS. "ZORO" agreed to meet with the CS in Bolingbrook, Illinois. At approximately 9:02 p.m., "ZORO" called the CS from phone number 310-388-7792 and told the CS to meet him at a truck stop in Joliet, Illinois.

3

8.      The CS was subsequently outfitted with an "Eagle" digital recording device and "Kel" transmitter to record his meeting with "ZORO." At approximately 9:34 p.m. on November 30th, a blue Chevy Silverado truck with temporary Illinois license plate 176F728, registered to a woman with the last name of RAMIREZ, pulled alongside the CS. After a short conversation between the CS and the driver of the truck, the truck pulled away and parked. An Agent then called the CS, and the CS confirmed that the driver of the truck was "ZORO." At approximately 9:37 p.m., the CS and "ZORO" began conversing at the Subway restaurant inside the truck stop about narcotics and other aspects of drug trafficking. At approximately 10:35 p.m., the CS and "ZORO" ended their meeting, and "ZORO" drove away from the truck stop. At approximately 10:50 p.m., Will County Sheriff Gang Officers conducted a traffic stop of "ZORO's" vehicle. "ZORO" identified himself as EDUARDO RAMIREZ and stated that he lived at 600 Francis Street Apt. #2, Joliet Illinois. RAMIREZ, however, did not have any valid identification with him. RAMIREZ subsequently called his wife, who brought alien identification card #A044613937 for proof of RAMIREZ'S identity.   The alien identification number was subsequently found by agents to be invalid.

9.      On January 2, 2006, the CS called Agents and informed them that RAMIREZ called the CS and asked if the CS was interested in buying multi kilograms of cocaine. The CS informed RAMIREZ that he would put his cousin in contact with RAMIREZ. Agents then formulated a plan to have an undercover officer ("UC") pose as the CS's cousin. The UC subsequently placed a recorded telephone call to RAMIREZ during which they discussed meeting to talk about the drug deal.

4

### Meeting between RAMIREZ, ARMENTA, and the UC

10.     On January 05, 2006, at approximately 11:05 a.m., the UC placed a telephone call to RAMIREZ (aka "ZORO") at phone number (815)740-6497 and left a voice message. At approximately 11:25 a.m., the UC placed a second call to RAMIREZ, at which time they agreed to meet at the Sears parking lot, located at Westfield's Joliet Mall in Joliet, Illinois. The UC was then given an "Eagle" digital recorder and transmitting device to record the meeting.    At approximately 12:16 p.m., Agents observed a blue Chevrolet pickup truck with temporary Illinois license plate 176F728 enter the Sears parking lot. The pickup truck was occupied by two males. At approximately 12:18 p.m., Agents observed the UC enter the Sears parking lot and exit his vehicle. At approximately the same time, the two males in the blue pickup truck exited their vehicle. The male who was wearing a baby blue sweatshirt with a white hat was identified as EDUARDO RAMIREZ. The other male was later identified as JUAN PABLO ARMENTA.  Agents observed the UC, RAMIREZ, and ARMENTA greet each other and then go inside the Joliet Mall via the Sears store entrance. Agents then followed the UC, RAMIREZ, and ARMENTA inside the Sears store and observed them conversing while walking inside the mall. They discussed details of the planned drug transaction, including where the transaction would take place and how much drugs the UC would purchase.[2]    At approximately 12:43 p.m., Agents observed the UC, RAMIREZ, and ARMENTA exit the mall through the Sears store exit. The UC then

_____

[2]Conversations between the UC and RAMIREZ and ARMENTA were in Spanish. This affiant understands the Spanish language and summaries of the recorded Spanish conversations are based on this affiant's preliminary translation of them.

5

entered his vehicle and exited the area. At approximately the same time, Agents observed RAMIREZ and ARMENTA re-enter the mall through the Sears store entrance.

11.     At approximately 1:05 p.m., the UC placed a call to RAMIREZ to further discuss the potential drug deal. At approximately 1:20 p.m., Agents observed both RAMIREZ and ARMENTA exit the mall and enter the blue pickup truck described above. The pickup truck was then observed driving to 315 Willard Street in Joliet, Illinois. At approximately 1:30 p.m., Agents observed both targets exit the blue pickup truck and enter 315 Willard Street, Joliet, Illinois. A short time later, Agents observed RAMIREZ exit 315 Willard and talk on his mobile telephone while standing in front of the residence. RAMIREZ then re-entered the residence. At approximately 3:00 p.m., Agents observed RAMIREZ exit 315 Willard, drive the blue pickup truck to 600 Francis Street in Joliet, Illinois, and enter the residence. At approximately 3:50 p.m., the UC made another recoded call to RAMIREZ at which time the UC and RAMIREZ decided to postpone the drug deal until a later date because RAMIREZ was still waiting for his source of supply.

### The 1/20/06 Drug Deal and Recovery of Five Kilograms of Cocaine

12.     On January 19, 2006, the CS called Agents and informed them that RAMIREZ wanted to sell five kilograms of cocaine. The CS also told agents that RAMIREZ wanted to deal with the CS only because he felt more comfortable with the CS than with the CS's cousin (i.e., the UC).

13.     On January 20, 2006, at approximately 6:20 p.m., the CS was outfitted with an "Eagle" digital recording device and "Kel" transmitter. At approximately 7:00 p.m., the CS arrived at 600 Francis Street, Joliet, Illinois. The CS picked up RAMIREZ

and then drove to 315 Williard Street, Joliet, Illinois. RAMIREZ then exited the CS's vehicle and walked up the side driveway of 315 Williard Street, Joliet, Illinois out of view. A short time later, RAMIREZ returned to the CS's vehicle and showed the CS one kilogram of cocaine. RAMIREZ then went back up the side driveway of 315 Williard Street with the cocaine. The CS subsequently informed Agents that RAMIREZ showed the CS one kilogram of cocaine and that RAMIREZ and other targets wanted to see the money. Agents advised the CS to tell RAMIREZ to have all five kilograms brought out to his vehicle. Agents subsequently observed RAMIREZ and another unknown male (later identified as JOSE ERASIMO AGUILERA) exit 315 Willard Street, Joliet, Illinois, and walk towards the CS's vehicle. The CS then called agents and informed them that RAMIREZ and AGUILERA (unknown to the CS) brought all five kilograms to the CS's vehicle. At this time the arrest signal was given, and agents arrested RAMIREZ and AGUILERA. Agents then recovered a white plastic bag containing five brick-sized packages wrapped in red plastic from the floor of the front seat area of the CS's vehicle. Agents field tested the white powdery substance in one of the packages, and it tested positive for cocaine.

14. Agents subsequently secured the perimeter of 315 Williard Street, Joliet, Illinois. Agents then knocked on the upstairs rear apartment, which was answered by ARMENTA. At that time, the UC officer, who met with RAMIREZ and ARMENTA on January 5, 2006, at the Joliet Mall, identified ARMENTA as being the person who was with RAMIREZ at the meeting. At this time, ARMENTA was asked to step outside the apartment and was then placed under arrest.

7

15.    At approximately 10:40 p.m., Agents orally advised RAMIREZ of his Miranda rights in English and presented him with a written copy of his rights in Spanish, which they then had him read aloud.  RAMIREZ then stated that he wanted to waive his rights and speak with Agents. He then informed agents that ARMENTA, who lives at 315 Williard Street, Joliet, Illinois, assisted him in setting up the deal with the CS. RAMIREZ stated ARMENTA called another individual whom he did not know and told that individual to bring the five kilograms of cocaine to 315 Willard, Joliet, Illinois. RAMIREZ further stated that after the five kilograms of cocaine were brought to 315 Willard, he and another man whom he did not know (later identified as AGUILERA) walked to the CS's van. RAMIREZ explained that he then placed a white plastic bag, which held the five kilograms of cocaine, on the floor between the two front seats of the van. RAMIREZ stated that he was going to be paid a couple of thousand dollars for his participation in the drug deal.

16.     Based upon the above facts and circumstances, I believe that there is probable cause to believe that on January 20, 2006, EDUARDO RAMIREZ, JOSE ERASIMO AGUILERA and JUAN PABLO ARMENTA possessed with intent to distribute 500 or more grams of cocaine, in violation of Title 21, United States Code, Section 841(a)(1).


Fernando Cervantes
Special Agent, Drug Enforcement Administration


Signed and subscribed to before me
On this 23rd day of January, 2006

MARTIN C. ASHMAN
U.S. Magistrate Judge

9